COMMONWEALTH OF PUERTO RICO -
COURT OF FIRST INSTANCE
SUPERIOR COURT OF SAN JUAN

| | |
|---|---|
| ROSA MARIA SANTIAGO CONCEPCIÓN, NATIVIDAD CONCEPCIÓN RIVERA<br>    Plaintiff | CIVIL ACTION NUMBER:<br><br><br>SJ2020CV03729 |
| V. | **DEFECTIVE PRODUCT AND INFORMED CONSENT** |
| DAVOL, INC., C.R. BARD, INC., BARD SHANNON LTD., FRANCISCO A. BATLLE BATLLE<br>    Defendants | |

**AMENDED COMPLAINT**

**TO THE HONORABLE COURT:**

**APPEARS** Rosa Maria Santiago Concepción y Natividad Concepción Rivera, represented by the attorneys who sign, and very respectfully ALLEGE and REQUEST:

**INTRODUCTION**

1.    Ms. Santiago was admitted to San Francisco Hospital, located in San Juan, Puerto Rico, on December 19, 2017 to have an operation due to a prior diagnosis of an umbilical hernia. During the operation, two segments of her small intestine, connective tissue (fibromembranous), part of the peritoneum, as well as the hernial, were removed.

2.    Between June 11, 2019 and June 15, 2019, Ms. Santiago spent four days at home with stomach pain, vomiting and not being able to eat. On June 15, she went to San Francisco Hospital in San Juan, Puerto Rico. She was admitted to the emergency room as the patient was complaining of abdominal pain, especially in the umbilical area where they had previously worked on her hernia. She also had nausea and continuous vomiting. These symptoms are directly related to a hernia. Medical surgeon Francisco A. Batlle Batlle recommended that Ms. Santiago undergo surgery the next day and not leave

the hospital. About the surgery, the only thing medical surgeon Francisco A.

Batlle Batlle told Ms. Santiago was "I'm going to put in a mesh". Nothing

else. Surgery was the next day (June 16, 2020) and a surgical mesh known as

Ventrio™ ST Hernia Patch (Ventrio™ ST) from the company C.R. Bard,

Inc., Davol, Inc., and Bard Shannon Ltd., was placed in Ms. Santiago's body

the label of which is shown below:



(Hereinafter, for identification purposes, we refer to this surgical mesh that was

placed in Ms. Santiago's body as "the mesh in question" or "the defective mesh").

3.      The next day, **June 16, 2019**, Ms. Santiago had to undergo surgery again at

the aforementioned San Francisco Hospital to repair her umbilical hernia.

As a result, she has had to take fourteen or more drugs to reduce or minimize

the pain she felt by reason of her concurrent problems with hernia.

4.      On **March 23, 2020,** the patient went to the San Francisco Hospital emergency room with the following symptoms: rapid heartbeat (BPM), fever, chills, arthralgia, and severe pain in the abdominal area due to an obstruction by the umbilical hernia and presenting a clinical symptoms of sepsis. At San Francisco Hospital she was stabilized in the first instance with antibiotics, but nonetheless the patient spent eight days in the hospital. At the time of discharge, the patient was prescribed four additional drugs to help her with symptoms. Notwithstanding, she was also given instructions to go to the emergency room if such symptoms returned. They also recommended a follow-up appointment within seven days along with various studies of the body to know if her health detriment is related to the surgical mesh, which has not shown to be useful at the time in containing her umbilical hernia, for which she filed a civil liability action against the aforementioned companies for the defective product.

## PARTIES

5.      The co-plaintiff **ROSA MARIA SANTIAGO CONCEPCIÓN** is of legal age and a resident of Puerto Rico and we refer to her in this civil action as "Ms. Santiago". Her postal and physical address is: Calle Gibraltar 446 Barrio San José San Juan, PR 00923. Her phone number is: (939) 4606712. The co-plaintiff Natividad Concepción Rivera is the mother, Ms. Santiago and her closest relative, who has been harmed as a result of the situation described in this complaint. **Her postal and physical address is: Calle Gibraltar 446 Barrio San José San Juan,** PR 00923. Her **phone number is: (939) 265-0281.** Hereinafter, we refer collectively to Ms. Rosa Maria Santiago Concepción and Ms. Natividad Concepción Rivera as the "plaintiff".

**6.**     Co-defendant Davol, Inc. (hereinafter referred to as "Davol") is a subsidiary of the Co-defendant C.R. Bard, Inc. (hereinafter referred to as "Bard"). Davol is a corporation in the state of Delaware that has its headquarters in the state of Rhode Island. Davol is a company that does business in all states and territories of the United States of America, including Puerto Rico. Its business is the research, development, design, manufacturing, production, marketing, sale and distribution of surgical meshes, including the defective mesh in question. Davol has intentionally wanted to have substantial contact with Puerto Rico doing business in Puerto Rico and receiving the benefit of doing business in this jurisdiction, which includes substantial economic benefits amounting to millions of dollars annually. Moreover, regardless of the foregoing, Davol knew that the mesh in question would be sold in Puerto Rico. Davol makes its sales and offers sales training from its Rhode Island headquarters and what is known as the "Davol Davol Biosurgery Surgical Education Program" is operated from its headquarters in Rhode Island.

7.     Co-defendant Bard Shannon Ltd. (hereinafter referred to as "Bard Shannon") is an Irish company, but registered to do business in Puerto Rico (Registration 10929) and a subsidiary of the Co-defendant Bard. Bard Shannon operates a factory in San Gerónimo Industrial Park Lot 1 Road 3 KM 77.5 Humacao, Puerto Rico, and was the company that manufactured, sold or distributed the defective mesh in question.

**8.**     Co-defendant Bard is incorporated and has its headquarters in the state of New Jersey, and the parent company and majority shareholder of Davol and Bard Shannon. Bard does business in all or almost every country in the world and is engaged in the development, manufacture, production, sale and marketing of medical equipment, including the defective mesh in question. Bard is the principal player in the hernia surgical mesh market in the United States and participates in the manufacture and distribution of surgical

meshes, including the defective mesh in question. Bard supplies Davol and Bard Shannon with materials used in the manufacture of surgical meshes, including the defective mesh in question. Bard has been and is responsible for the actions of Davol and Bard Shannon as it has exercised control over Davol and Bard Shannon's actions to monitor and comply with regulatory safety standards that apply to surgical meshes sold in the United States and Puerto Rico, including the defective mesh in question. Bard has committed or has allowed to be committed numerous violations of manufacturing safety and quality control standards, and deviated from design and manufacturing specifications.

9.    The co-defendant Francisco A. Batlle Batlle is a natural person and general surgeon (hereinafter, Dr. Batlle). Dr. Batlle was the surgeon involved in Ms. Santiago's June 2019 operation and the consulting physician in March 2020. The co-defendant Francisco A. Batlle Batlle has an office at Avenida De Diego Núm. 369, Suite 610, San Juan, PR, 00923 and his phone number is (787) 771-4595.

10.    The defendants are jointly and severally liable for the damage suffered by Ms. Santiago as a result of the design, manufacture, marketing, labeling, lack of adequate warnings, distribution, sale, and placement of the defective mesh in question on the market, either by them or through their agents, employees or owners, who acted at all times within their functions with real or apparent authority. The defendants are also vicariously liable for the acts and omissions of their employees, who acted at all times within the functions of their employment.

### VENTRIO™ ST HERNIA PATCH: DESCRIPTION, RISKS, COMPLICATIONS AND LACK OF INFORMED CONSENT

11.     The defective product in question known as Ventrio™ ST Hernia Patch (Ventrio™ ST) can be briefly described as a permanent self-impregnable mesh with bioresorbable coating for rebuilding soft parts with SORBAFLEX memory technology™. More specifically, VENTRIO™ ST is a partially resorbable, self-impregnable and sterile prosthesis with a bioresorbable coating that features two distinct layers of mesh sewn together with PTFE monofilaments[1] to form a placement pocket. The top layer consists of a polypropylene monofilament (PP) mesh,[2] while the bottom layer is a mesh made of the compound SEPRAMESH™ TP. The compound SEPRAMESH™ IP is woven with fibers of (PP) and polyglycolic acid (PGA) that results in a two-sided mesh, one side of PP and the other of PGA. The mesh is coated, on the PGA side, by a chemically modified and bioresorbable sodium hyaluronate hydrogel (HA), carboxymethyl cellulose (CMC) and polyethylene glycol (PEG). In theory, the face of the mesh fascia allows a rapid fibroblastic response through the interstitials of the mesh, which is supposed to allow the internal growth of the fabric towards the mesh. The visceral face of the mesh is a bioresorbable coating, which separates the mesh from the underlying tissue and surfaces of the organs to reduce the fixation or adhesion of the fabric to the mesh. Shortly after placement, the biopolymer coating becomes a hydrated gel that is

---

[1] Polytetrafluoroethylene (PTFE) better known as Teflon is a polymer similar to polyethylene, in which hydrogen atoms have been replaced by fluoride atoms. The chemical formula of the monomer, tetrafluoroethene, is CF2=CF2.

[2] The Polypropylene (PP) is the thermoplastic polymer, partially crystalline, obtained from the polymerization of propylene (or propene). It belongs to the polyolefins group and is used in a wide variety of applications including food packaging, fabrics, laboratory equipment, automotive components and clear films. It has great resistance against various chemical solvents, as well as against alkalis and acids

reabsorbed into place in less than 30 days. This medical device features SORBAFLEX™ memory technology, which is supposed to offer memory characteristics and stability to the mesh, making it easy to insert it initially, position it correctly and fasten it. SORBAFLEX ™ memory technology refers to an extruded polydioxanone (PDO) monofilament component contained in a woven polypropylene mesh tube. The oval oversized patches include two separate PDO SORBAFLEX™ monofiliaments. The PDO SORBAFLEX™ monofilament completely degrades *in vivo* through hydrolysis. The PDO monofilament has been found to produce an inflammatory response during absorption. In essence, the absorption is completed in about 6-8 months.

12. Ventrio™ ST is indicated for use as a reinforcement of soft tissue, when there is weakness, in procedures that require tissue repair, such as hernia repair. By nature, Ventrio™ ST is contraindicated for nursing mothers and children. It also cannot be used for the reconstruction of cardiovascular defects. Ms. Santiago was not a child or a nursing mother at the time of the placement of the Ventrio™ ST in her body for the purpose of repairing an umbilical hernia.

13. The manufacturer of Ventrio™ ST has admitted that there are publications suggesting that the possibility of adhesion formation may exist when polypropylene is placed in contact with the intestines or viscera.

The co-defendant Francisco A. Batlle Batlle did not discuss these risks associated with the placement of the Ventrio™ ST with Ms. Santiago. Nor was Ms. Santiago given written information at any time describing the risks associated with placing the Ventrio™ ST in her body. About the risks associated with Ventrio™ ST, the only thing the co-defendant Francisco A. Batlle Batlle told Ms. Santiago was "I'm going to put a mesh in you". Nothing else. At no time were alternatives to surgical treatments or meshes discussed.

14.     The manufacturer of Ventrio™ ST has admitted that among the possible adverse reactions to the product are seromas, adhesions, bruising, inflammation, extrusion, fistula formations, infection, allergic reaction and recurrence of the hernia or defect of soft tissues, as well as infection and intestinal or skin perforation. The co-defendant Francisco A. Batlle Batlle did not discuss these possible complications associated with the placement of the Ventrio™ ST with Ms. Santiago. Nor at any time was Ms. Santiago given written information describing the possible complications associated with placing the Ventrio™ ST in her body. About the possible complications associated with Ventrio™ ST, the only thing the co-defendant Francisco A. Batlle Batlle told Ms. Santiago was "I'm going to put a mesh in you". Nothing else. At no time were alternatives to surgical treatments or meshes discussed.

**VENTRIO™ ST HERNIA PATCH: A DEFECTIVE PRODUCT**

15.     Thousands of consumers have filed court and extrajudicial claims against Ventrio™ ST manufacturers under defective product theories.

**16.** In the criminal proceedings <u>United States v. CR Bard. Inc..</u> 848 F. Supp. 287 (D. Mass. 1994), the company C.R. Bard, Inc. plead guilty to 391 felonies. The federal court described the conduct in summary as follows: *"These are serious criminal violations. Bard knowingly and willfully kept adverse information from the FDA, made product changes that affected the safety or effectiveness of angioplasty catheters produced by its USCI Division without the required FDA approval, and illegally did testing on human beings without the required exemption from the FDA."*

17. C.R. Bard and Davol have paid millions of dollars in compensation to consumers and patients who have filed court and extrajudicial claims alleging that the Ventrio™ ST is a defective product that caused harm.

18. As discussed, Ventrio™ ST contains polypropylene. Manufacturers claim that polypropylene is chemically inactive or inert. However, scientific evidence shows that polypropylene is incompatible with human tissue and promotes an immune response in people who are exposed to polypropylene. The immune response, in turn, promotes the degradation and contraction of the Ventrio™ ST, as well as the surrounding tissue, and contributes to the development of adverse reactions.

19. Entities that have supplied various forms of polypropylene to the defendant manufacturers of Ventrio™ ST warned that polypropylene should not be used in medical devices that were permanently implanted in the human body or that were in constant contact with human tissue or fluids.

20. Ventrio™ ST is defective due to the high number of cases in which: (i) it fails, (ii) causes damage, (iii) causes complications and (iv) does not meet the intended objective. The foregoing often results, with unreasonable frequency, in the need for further surgery, which causes severe damage, as is the case with Ms. Santiago.

21.     Some of the specific defects of Ventrio™ ST are:

    a.   Polypropylene and immune reactions resulting from polypropylene use cause adverse reactions and damage.

    b.   Immune reactions caused by polypropylene cause adhesions, damage to organs, nerves, blood vessels that are around the mesh. They also cause infections, chronic pain and recurrence of the hernia.

    c.   It is prone to degrade and fragment over time, causing chronic inflation and fibrosis, resulting in continuous damage as polypropylene continues to act as a chronic catalytic for inflammation.

    d.   The manufacturers are believed to have used polypropylene that is below generally accepted standards or have altered the polypropylene used in the polypropylene mesh placed in Ms. Santiago's body.

    e.   The polypropylene mesh fabric produces very small openings that allow bacteria to enter and hide from white blood cells and macrophages, which are the body's defenses designed to eliminate bacteria. Bacteria also secrete a biofilm that coats them, further protecting them from destruction by white blood cells and macrophages. In addition, some bacteria are able to degrade the polypropylene.

    f.   Polypropylene is always impure; there is no pure polypropylene. Polypropylene contains approximately 15 additional compounds that are filtered from the product and are toxic to tissues, increasing the inflammatory reaction and the intensity of fibrosis.

g. It has been observed through the use of electronic microscopes that polypropylene meshes are not inert. Mesh degradation results in detachment, cracks and release of toxic compounds. This enhances inflammatory and fibrotic reactions.

h. Polypropylene meshes were known were shrinking by 30-50% in approximately 1998.

i. Polypropylene tends to oxidize as a result of the acids that are produced during the inflammatory reaction, causing degradation of polypropylene mesh.

j. The porosity of the mesh is important for the growth of the tissue, and the low porosity decreases the incorporation of tissue. Porosity also affects the inflammatory and fibrotic reaction. With mechanical stress, effective porosity decreases.

k. After being implanted in the human body, polypropylene is known to become depolymerized and suffer oxidative degradation by free radicals[3] and develop stress cracks.

l. The polypropylene surface promotes the absorption of liquids and bacteria, and is a "bacterial highway" that provides a safe haven for bacteria.

m. Common complications associated with polypropylene include restricted abdominal wall mobility and local wound abnormalities. Polypropylene failures often include persistent and active inflammatory processes, irregular or low formation of scar tissue, and poor mesh integration into the regenerative tissue area.

---

[3] The free radicals are formed in the middle of chemical reactions, from the homolytic rupture of a molecule and, in general, it is extremely unstable and therefore has great reactive power and a very short half-life (milliseconds).

22.    The Ventrio™ ST used heavy polypropylene with small pores, which further promotes inflammation, foreign body reaction and subsequent complications.

## THE CIVIL LIABILITY OF THE MANUFACTURERS

23.    The manufacturers marketed the Ventrio™ ST when it knew or should have known that it was defective. The manufacturers had an obligation to know and disclose in a timely and appropriate manner the scientific and medical information about Ventrio™ ST, as well as to fully warn about its risks and side effects, but this was not done. The manufacturers also knew or should have known that Ventrio™ ST exposed consumers and patients to unreasonable risks of severe bodily harm and disproportionately to the potential benefits associated with using mesh, especially when viable and safe alternatives that did not present the same level of risk or complications were available. For marketing purposes, the manufacturers intentionally extolled the alleged benefits of Ventrio™ ST and in turn minimized or omitted its risks and adverse effects. The manufacturers knew their claims were false and misleading, and did not adequately disclose the true health consequences and true risks and adverse effects of Ventrio™ ST. Nor did the manufacturers give sufficient warnings or instructions on the level of risk, complications and danger posed by the use of Ventrio™ ST.

24.    The risks of the Ventrio™ ST design outweigh any potential benefit associated with the design. As a result of its defective design and/or manufacture, an unreasonable risk of serious adverse complications may occur, including, among others: foreign body reaction; granuloma response; allergic reaction; rejection; erosion; excessive and chronic inflammation; internal organ adhesions; scarification; inadequate wound healing; infection; seroma; abscess; fistula; tissue damage and/or death; nerve damage; chronic

pain; recurrence of hernia; and other complications. The manufacturers did not mention the risks, dangers, defects and disadvantages of Ventrio™ ST in their marketing, but however promoted, marketed, sold and distributed Ventrio™ ST as if it were reasonably safe. In turn, Ventrio™ ST manufacturers have stopped disclosing information about the mesh's tendency to fail and cause bodily harm as well as complications.

25.    These actions and omissions by the mesh manufacturers were factors that substantially contributed to the serious damage suffered by Ms. Santiago. Ms. Santiago would not have agreed to the placement of the mesh in her body had the manufacturers disclosed all the consequences to her health, as well as all the risks and complications caused by Ventrio™ ST.

26.    Ventrio™ ST manufacturers stopped making the following reasonable warnings:

   a.   The propensity of Ventrio™ ST to degradation and fragmentation.

   b.   The way and how quickly Ventrio™ ST erodes.

   c.   The risks of chronic inflammation.

   d.   The risks of chronic infection.

   e.   That the size of the mesh would drastically shrink once implanted.

   f.   Risk of hernia recurrence, hernia-associated pain and other mesh-associated pains.

g.  The possible need for subsequent surgery.

h.  The severity of possible complications.

i.  The dangers associated with the mesh.

j.  That mesh treatments can be just as effective as other treatments.

k.  That mesh poses potential risks that are not present with other alternatives.

l.  That future hernia treatment is more difficult and complicated when mesh has already been used.

m.  Increased risk of further surgery.

n.  That if there is a complication, removing the mesh completely could be medically impossible and can result in permanent complications, including chronic pain.

27.  Ventrio™ ST was implanted in Ms. Santiago's body in a way that was foreseeable for the defendant manufacturers. Manufacturers published technical instructions for the implantation of these in the human body. That is why Ms. Santiago has experienced great pain and suffering as a result of the defective mesh.


**THE APPLICABLE LAW OF DEFECTIVE PRODUCTS IN PUERTO RICO**

28.  In Puerto Rico, strict liability is imposed on the manufacturer, distributor and seller for damage caused by defective or dangerous products. Rivera v. Superior Pkg. Inc.. 132 DPR (Decisiones de Puerto Rico) [Decisions of Puerto Rico] 115, 125 (19921; Montero Saldaña v. Amer. Motors Corp.. 107 DPR 452, 462 (1978); Ferrer v. General Motors Corp.. 100 DPR 246 (1971). Any person involved in the manufacturing and distribution chain is jointly and severally liable with the manufacturer to the injured person. See H. Brau del Toro. Torts and damages in Puerto Rico [Los daños y perjuicios extracontractuales en Puerto Rico], San Juan, Pubs. JTS (Jurisprudencia del

Tribunal Supremo de Puerto Rico) [Case Law of the Supreme Court of Puerto Rico], 1986, Vol. II, Chap. XVI, p. 90.

29.    The defective product is defined as a product that does not equal the average quality of similar products. Montero Saldaña v. Amer. Motors Corp.. 107 DPR 452, 462 (1978). The doctrine is based on the case that any person involved in the manufacturing and distribution chain is jointly and severally liable with the manufacturer to the injured person. Montero Saldaña v. Amer. Motors Corp.. 107 DPR 452, 462 (1978). The plaintiff does not have to provide proof of negligence by the manufacturer or seller, but must prove that the product was defective and that the defective product was the cause of the injuries suffered. Aponte v. Sears Roebuck of P.R. 144 DPR 830, 839 (1998).

30.    The Supreme Court of Puerto Rico has approved the strict liability in torts rule, established by the California Supreme Court in the case of Greenman v. Yuba Power Products. Inc.. 377 P.2d 897, 900 (Cal. 1962). There, Presiding Judge Traynor thus stated the rule: "...a manufacturer is strictly liable for damages when an item placed on the market, knowing that it will be used without an inspection for defects, demonstrates a defect that causes harm to a human being [and that] liability is not governed by the law of contractual guarantees but by the law of absolute liability for damages". The public policy underpinning the rule set out in that case is that "the purpose of such liability is to ensure that the cost of damage resulting from defective products is borne by the manufacturers who shipped such products to the market rather than the affected persons who are powerless to protect themselves". Aponte v. Sears Roebuck, *supra*. The manufacturer or seller is responsible for defects of their product, provided that the injured party uses it for use that is reasonably foreseeable by the manufacturer. Aponte v. Sears Roebuck, *supra*.

31.   According to case law, in the field of product liability, there are three (3) types of defects that give room for the application of the doctrine of strict liability. These are: manufacturing defects, design defects and insufficiency defects in warnings or instructions. Aponte v. Sears Roebuck, *supra.* Regarding design defects, the California Supreme Court developed an analysis, or "test," of two alternatives. Thus, the plaintiff will prevail in a design defect case if it demonstrates that: "(1) the product failed to behave as safely as an ordinary consumer would have expected when using the product for which it was intended or for which it could predictably be used, or if he demonstrates that, (2) [a] the design of the product was the proximate cause of the damage and [b] the respondent did not prove that on the balance of interests, the benefits of the design in question outweigh the risks of the danger inherent in the design". Under the second alternative, the burden of proof that the benefits of the design used outweigh the risks inherent in it is shifted to the manufacturer. Aponte v. Sears Roebuck, *supra.*

32.   With regard to manufacturing defects, the Supreme Court of Puerto Rico adopted the definition of "defect" suggested by the then Presiding Judge Traynor, in the case of Greenman v. Yuba Power Products Inc, supra, to the effect that "a defective product may be defined as one that fails to match the average quality of similar products and the manufacturer is then liable for damages resulting from deviations from the standard". Mendoza v. Cervecería Corona. Inc.. 97 DPR 499. 512 (19691.

33.   In the third type of defect, even if a product does not suffer from manufacturing or design defects, it is considered defective if the manufacturer or seller does not offer the user or consumer those warnings or instructions that are appropriate regarding the dangers or risks inherent in the handling or use of the product. This duty extends to all uses of the product that are reasonably foreseeable by the manufacturer. Failure to warn

exposes the manufacturer to liability, if the manufacturer knew, or should have known, of the danger or risk involved, and the need to give the warning to ensure the safest use of the product. <u>Aponte v. Sears Roebuck,</u> supra.

34.  It has been established that where there is a dispute over the defects of a product, it is necessary to use expert evidence to establish element of defectiveness, at least when it is not an obvious defect. <u>Randolph v. Collectramatic. Inc.</u> 590 F.2d 844, 848 (10th Cir. 1979); <u>Huddell v. Levin.</u> 537 F.2d 726, 736 (3rd Cir. 1976).

35.  As a result of the coordinated activities of all the defendants mentioned above, a defective medical hernia mesh was implanted in the body of the claimant. The defendants are jointly and severally liable for the damages of the plaintiff caused by the manufacture, design, marketing, distribution, sale and placement of a defective surgical mesh directly or indirectly through their employees, contractors or agents in the ordinary course of their business activities.

36.  It is alleged that the defendants had a legal duty to ensure the effectiveness and safety of the surgical mesh through valid and controlled studies before marketing them. It is believed that the studies that were done might have been deliberately manipulated, resulting in information.

37.  The defendants emphasized at all times that the surgical mesh was a safe and effective product. However, the surgical mesh that was designed and/or manufactured was not reasonably safe for its purpose, containing and repairing a hernia, and the risks associated with the design exceeded the potential benefits of that design. As a result of the design and/or manufacture of the surgical mesh, there was an unreasonable risk of the following adverse reactions to mesh or mesh components: chronic pain, hernia recurrence, to foreign body reaction; rejection, infection, insufficient or failed incorporation; migration, mesh deformation; insufficient or inappropriate

healing, excessive and chronic inflammation; adhesion to other organs; erosion, abscess, fistula formation, granuloma, seromas, nerve damage, tissue damage and/or death, as well as other complications. The medical documents in the possession of the hospital and defendant surgeon confirm that the plaintiff experienced several of these symptoms and that her body rejected the defective mesh.

38.     The hernia surgical mesh is thought to have been designed and/or manufactured in such a way that it lacked enough strength to tolerate normal abdominal efforts, resulting in recurrence of the hernia.

## LACK OF INFORMED CONSENT

39.     The co-defendant Francisco A. Batlle Batlle was not in the same position as the mesh manufacturers to know, and therefore inform Ms. Santiago, about all possible complications, risks and dangers of the mesh.

40.     Co-defendant manufacturers publish information on possible mesh risks and complications, as described in paragraph 13 and 14 of this complaint.

41.     The information published by manufacturers about the risks and complications of mesh is incomplete, inaccurate and misleading.

42.     The co-defendant Francisco A. Batlle Batlle did not inform Ms. Santiago of that information on the risks and complications published by the mesh manufacturers, which Ms. Santiago considers incomplete, inaccurate and misleading.

43.   About the risks and possible complications associated with Ventrio™ ST, the only thing the co-defendant Francisco A. Batlle Batlle told Ms. Santiago was "I'm going to put a mesh in you". Nothing else. At no time were alternatives to surgical treatments or meshes discussed.

44.   The co-defendant Francisco A. Batlle Batlle did not make a faulty disclosure, but completely failed to inform on the possible risks and complications.

45.   Ms. Santiago, not having *any* information about the potential risks or complications associated with it, was not in a position to give informed consent.

46.   Ms. Santiago was admitted to San Francisco Hospital on June 15, 2019. That day, co-defendant Francisco A. Batlle Batlle informs her that he was going to operate on her the next day and tells her "I'm going to put a mesh in you".

47.   The following day, June 16, 2019 at 10:34 a.m. Ms. Santiago signed a form which reads, in relevant part: "The nature and objectives of the treatment, the benefits, the alternatives of the same, the risks and the possibility of complications have been widely explained to me. I acknowledge that I have not been offered any guarantee or assurance as to the results that may be obtained from such treatment."

48.   This form signed on June 16, 2019 at 10:34 a.m. is a generic form that does not mention the treatment in question let alone make references to alternatives, risks or complications. That is, the document itself does not constitute an explanation of the treatment, alternatives and risks of complications. Rather, the document that states that everything was "widely explained" by the co-defendant Francisco A. Batlle Batlle. But the truth is that the statements of the co-defendant Francisco A. Batlle Batlle of June 15, 2019 ("I'm going to put a mesh in you"), do nothing more than contrast dramatically with what is asserted in a generic and stereotypical way on the

form. In addition, on June 16, 2019, the day of the operation and the signing of consent form, Ms. Santiago did not see or speak to the co-defendant Francisco A. Batlle Batlle before the operation. Ms. Santiago does not believe that the co-defendant Francisco A. Batlle Batlle acted with malice, but proceeded without her informed consent. There were no legitimate medical reasons to proceed in a hasty manner and without the informed consent by Ms. Santiago on Father's Day of the 2019. Ms. Santiago certainly felt pain, but she was perfectly able to understand minimal information about the mesh that would be placed on her body, the possible risks and complications according to the manufacturer, and the treatment alternatives. However, the only thing that Ms. Santiago was told was "I'm just going to put a mesh in you," and then she never heard from the medical surgeon again until after the June 16, 2019 operation.

49.   Patient consent is an indispensable element in carrying out a surgical medical procedure, treatment or medical procedure that is invasive to the human body, except for exceptional emergencies and damage to the psychological state of patient apprehension. In order for this essential criterion to be understood to be met in cases of medical negligence, in addition to obtaining the express consent of the patient, it is necessary that such consent be informed. Rojas v. Maldonado. 68 D.P.R. 818, 827 (1948).

50.   The legal basis for such a requirement is that all people have the constitutional right to decide freely over their bodies. As a corollary to such a right, the courts have repeatedly held that doctors have an obligation to obtain informed consent from their patients prior to any treatment or surgery. The term informed consent imposes on physicians a duty to provide their patients with all the information that is essential to understand the nature of a certain procedure, which should include data on benefits, risks

and possible complications. <u>Martínez Marrero v. González Droz.</u> 180 D.P.R. 579, 593 (2011)

51. Generally, on this topic, the controversy centers on how much information the doctor must give the patient so that the patient's consent is not flawed or is sufficient to make an intelligent decision. The case law of the Supreme Court of Puerto Rico has reiterated that the physician must disclose both the reasonably foreseeable risks and the benefits of an invasive treatment or procedure. He must also provide available alternatives and the likely risks in case the patient chooses not to treat the condition. This was reiterated by the high court in <u>Rodríguez Crespo v. Hernández</u>. 121 D.P.R. 639, 663-664 (1988). In that opinion, the court proposed as a simple and clear rule the following:

> The doctrine of informed consent imposes a duty on the physician to inform the patient about the nature and risks of proposed medical treatment so that the patient is in a position to make an intelligent and informed decision. 121 D.P.R., on p. 664.

52. The risks associated with the mesh in question were widely known in June 2019 through countless reports, publications and thousands of civil claims that had been filed across the United States and internationally. The reasonable medical surgeon dedicated to placing surgical meshes would have been aware of these important developments. Given the number of victims of the mesh in question, a reasonable professional would have warned of risks, as these were not remote, but likely based on the scientific literature and the number of patients who have some form of complication after the placement of a mesh containing polypropylene. Had she been informed, Ms. Santiago would not have consented to the surgical mesh in question being placed in her, but would have explored other alternatives.

53.     As a result of the defendants' negligent actions and omissions, the plaintiff suffered physical harm and severe mental distress. After the invasive procedure on her body in June 2019, on March 23, 2020, Ms. Santiago went to the San Francisco Hospital emergency room with the following symptoms: rapid heartbeat (BPM), fever, chills, arthralgia, and severe pain in the abdominal area due to an obstruction by the umbilical hernia. At the hospital, it was determined that she showed clinical symptoms of sepsis, which had her on the brink of death, as the medical record proves. At San Francisco Hospital she was stabilized, but nonetheless Ms. Santiago spent eight distressing days in the hospital. Ms. Santiago has yet to undergo surgery again due to the defective mesh in her body, so the extent of the damage suffered cannot yet be determined in its entirety. The pain and suffering are not yet over for Ms. Santiago and her mother, Natividad Concepción Rivera.

**THEREFORE,** the plaintiff requests that all defendants be held liable, jointly and severally, for the physical, emotional and economic damages suffered, including medical expenses, and all attorney costs and fees to the fullest extent permitted by law and in accordance with the evidence presented.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on October 29, 2020.

s/Zuleika Castro De Jésus
Attorney s/Zuleika Castro De Jésus
PR Bar No.: RUA (Registro Único
de Abogados y Abogadas) [Unique
Reigster of Attorneys]-21258
FL Bar No.: 1022294
D'Jesus Law Offices
1969 S. Alafaya Trail «79
Orlando, FL 32828-8732
zcastro@djesuslaw.com
Phone: (407) 267-7130
Fax: N/A

s/José Carlos Vêlez Colón
Attorney José C. Vélez Colon
RUA 18913

421 Ave Muñoz Rivera
10th floor
jvelez@velezlawgroup.com
Phone: (787) 599-9003
Fax: N/A

**CERTIFICATION**

**I CERTIFY** that I submitted this brief through the SUMAC (Sistema Unificado de Manejo y Administración de Casos) [Unified Case Managment and Administration System] system, which will notify all attorneys of record.

Date: October 29, 2020.

s/José Carlos Vélez Colón
Attorney José C. Vélez Colon
RUA 18913
421 Ave Muñoz Rivera
10th floor
San Juan, PR 00918
jvelez@velezlawgroup.com
Phone: (787) 599-9003
Fax: N/A

**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jodeci Guzman, hereby certify that the document "**Concepcion, Rosa Maria Santiago - Complaint (Spanish Version)**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jodeci Guzman
(Currently situated in the County of New York)

Sworn to before me remotely this
November 20, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
STATE PUBLIC OF NEW YORK

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE